# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 30, 2014 Session

### IN RE K.M.K. ET AL.

**Appeal from the Juvenile Court for Bradley County**
**No. J-11-120    Daniel R. Swafford, Judge**

---

**No. E2014-00471-COA-R3-PT-FILED-FEBRUARY 27, 2015**

---

K.M.K. (Father) appeals the trial court's judgment terminating his parental rights to his son, K.M.K., and his daughter, K.M.K. (collectively, the Children). The petitioner, Department of Children's Services (DCS), removed the Children from their mother's home after it found them living in unsafe and unsanitary conditions. They were placed in foster care and subsequently adjudicated dependent and neglected. Nine months later, DCS filed a petition to terminate the parental rights of both parents.[1] The trial court terminated Father's rights based upon findings of (1) abandonment, (2) substantial noncompliance with a permanency plan, and (3) persistence of conditions. The trial court also determined that termination is in the best interest of the Children. Father appeals. We affirm the judgment of the trial court as modified in this opinion. Those modifications do not affect the trial court's decision to terminate Father's parental rights, which ultimate decision we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed as Modified; Case Remanded

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, and KENNY W. ARMSTRONG, JJ., joined.

Barrett T. Painter, Cleveland, Tennessee, for the appellant, K.M.K.

Robert E. Cooper, Jr., Attorney General and Reporter, and Ryan L. McGehee, Assistant Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]The Children's mother, A.M.E., has not appealed the trial court's order terminating her parental rights.

**OPINION**

I.

On February 11, 2011, DCS responded to a referral that alleged Children were living in unsafe and unsanitary conditions. Agents of DCS visited Mother's home where the Children were residing. Apparently, Father was not then living in the home. The parents had been living separate and apart since the fall of 2010. Their son was then two years and four months old, and their daughter was one year and three months. DCS discovered that the Children were living in an extremely dirty environment. There were large piles of clothing strewn about; several liquor bottles throughout the house, some of which were within reach of the children; bugs flying around the house; fleas jumping off the carpet; and a dog in the home. The smell of urine in the bedroom where Mother, her boyfriend, and the Children slept was "incredibly strong." There was little food in the house. DCS contacted Father. It determined that the Children could not be placed with him due to his admitted marijuana use, his statement that he was currently unable to care for them, and his belief that he had outstanding criminal warrants in states outside Tennessee. After a temporary, unsuccessful placement with the Children's grandparents, they were taken into DCS's custody on March 1, 2011.

A permanency plan was drafted on March 23, 2011. Father received and signed a copy of the plan on April 21, 2011. Previously, on April 7, 2011, DCS requested and obtained a no-contact order prohibiting Father's contact with the Children pending his resolution of any outstanding criminal warrants. Father later discovered that he had been mistaken and that there were no outstanding warrants. After Father provided DCS with evidence that he had no outstanding warrants, the no-contact order was lifted on May 18, 2011. Father then began supervised visitation with the Children.

Beginning on April 21, 2011, the Children were returned to Mother for a trial home visit. DCS's subsequent visits revealed, however, similar environmental neglect resulting from unsafe and unsanitary conditions in the home. The trial home visit with Mother ended May 17, 2011, the day before Father's no-contact order was lifted. DCS provided Father with a document setting forth and explaining the criteria, including the statutory grounds, and procedures for termination of parental rights. On April 25, 2011, Father signed the document, stating that he had "received a copy of Criteria & Procedures for Termination of Parental Rights and have been given an explanation of its contents."

After an adjudicatory hearing, the trial court entered an order on October 31, 2011, adjudicating the Children dependent and neglected. The only findings pertaining to Father in the order are as follows:

The children's biological father . . . was considered as a placement option but was deemed inappropriate due to his admitted drug use.

\* \* \*

Despite the efforts of Case Manager Crook to persuade the father otherwise, he has adamantly refused to give up marijuana. The father has informed Case Manager Crook that he could take one of the children, but not both.

On December 1, 2011, the trial court ordered Father to pay child support of $215 per month per child. Father made sporadic payments thereafter, but never made a full payment in any month before the date of the final termination hearing. The Children's foster care worker, Blaze Crook, testified that he attended a permanency hearing on April 26, 2012, at which Father testified. Crook stated that, at that hearing, Father said that the Children were "better off with the State, where they were," and that Father "didn't have any intention[] of completing" the requirements of the permanency plan. There is no transcript of this hearing in the record. Father was not questioned about these alleged statements at the termination hearing.

On July 24, 2012, DCS filed a petition to terminate parental rights. For grounds, DCS alleged: (1) abandonment by willful failure to visit;[2] (2) abandonment by willful failure to support;[3] (3) abandonment by failure to provide a suitable home;[4] (4) substantial noncompliance with the permanency plan;[5] and (5) persistence of conditions.[6] On April 1, 2013, DCS presented its evidence. On the second day of trial, August 19, 2013, Father presented his evidence. On October 30, 2013, the trial court entered an order finding that DCS had established, by clear and convincing evidence, all of the alleged grounds for termination except abandonment by failure to visit.[7] The trial court further found that

_____

[2]*See* Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(i), -102(1)(C), -102(1)(E) (2014).

[3]*See* Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(i), -102(1)(B), -102(1)(D).

[4]*See* Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(ii).

[5]*See* Tenn. Code Ann. §§ 36-1-113(g)(2), 37-2-403(a)(2).

[6]*See* Tenn. Code Ann. §§ 36-1-113(g)(3).

[7]DCS has not appealed the trial court's determination that Father did not abandon the Children by
(continued...)

termination was in the Children's best interest, and consequently terminated Father's parental rights. Father timely filed a notice of appeal.

## II.

Father raises the following issues:

> 1. Whether the trial court erred in concluding that Father had abandoned the Children by failing to support them.
>
> 2. Whether the trial court erred in finding that Father had abandoned the Children by failing to provide a suitable home.
>
> 3. Whether the trial court erred in finding that Father was in substantial noncompliance with the permanency plan.
>
> 4. Whether the trial court erred in finding that, pertaining to Father, persistence of conditions existed that in all probability would cause the Children to be subjected to further abuse or neglect.
>
> 5. Whether the trial court erred in finding that termination of Father's parental rights was in the best interest of the Children.

## III.

With respect to parental termination cases, this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best

---

[7](...continued)
willfully failing to visit.

-4-

interest[ ] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S.*, E2011–00517–COA–R3–PT, 2011 WL 4553233 at *11–12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

On our review, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id.*; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's judgment of witness credibility, which determinations will not be disturbed absent clear and convincing evidence to the contrary. *See* **Jones v. Garrett**, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. **Langschmidt v. Langschmidt**, 81 S.W.3d 741 (Tenn. 2002). We proceed mindful that only a single statutory ground must be clearly and convincingly established in order to justify a basis for termination. **In re Audrey S.**, 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

IV.

A.

Father argues that the trial court erred in finding that he abandoned the Children by failing to support them. As pertinent to this statutory ground, the Supreme Court has recently observed as follows:

Abandonment is one of the grounds for termination of parental rights. Tenn. Code Ann. § 36–1–113(g)(1). Abandonment is defined as the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights. Tenn. Code Ann. § 36–1–102(1)(A)(i) (2010). To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no

-5-

attempt to do so, and had no justifiable excuse for not doing so. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). . . .

We begin our analysis with the ground of abandonment based on willful failure to support. Willful failure to support or to make reasonable payments toward support means "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36–1–102(1)(D). A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control. *See In re Adoption of A.M.H.*, 215 S.W.3d at 810 (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child). A parent may not attempt to rectify abandonment by resuming payments of support subsequent to the filing of "any petition" seeking to terminate parental rights or seeking to adopt a child. Tenn. Code Ann. § 36–1–102(1)(F).

*In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2012).

In this case, the relevant four-month period is March 24, 2012 to July 23, 2012, this last day being the day before the petition was filed. As noted, Father was ordered on December 1, 2011, to pay $215 per month per child. His child support payments were "few and far between." DCS provided evidence documenting Father's payments from December of 2011 through March of 2013. During the four months preceding the filing of the petition, he made one payment on April 30, 2012, of $100, which DCS applied $50 for each child. After making this payment, Father went nine months without paying any child support.

Father argues that his failure to pay child support was not "willful." Tennessee courts have repeatedly emphasized the importance of a trial court's finding that a parent's conduct is willful when abandonment is alleged as a ground for termination of parental rights. *See, e.g., In re Alysia S.*, No. M2013-02596-COA-R3-PT, 2014 WL 7204406 at *21 (Tenn. Ct. App. M.S., filed Dec. 17, 2014) (" 'The requirement that the failure to visit or support be "willful" is both a statutory and a constitutional requirement.' . . . Therefore, the element of willfulness is essential and central to the determination of abandonment"); *In re M.L.D.*, 182

S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re Audrey S.*, 182 S.W.3d at 863-64 (The concept of "willfulness" is at the core of the statutory definition of abandonment. . . . *triers-of-fact* must infer intent from the circumstantial evidence, including a person's actions or conduct.") (emphasis added).

In this case, the trial court did not expressly find that Father's failure to pay was willful, nor did the court make any findings regarding Father's income or earning capacity. The only finding the trial court made in support of its conclusion that DCS had established abandonment by failure to support by clear and convincing evidence is as follows, quoted in its entirety:

> [Father] has failed to pay child support as ordered by the Court. [Father] was ordered by this Court on December 1, 2011 to pay $215 per month per child to the State of Tennessee for child support. To date, [Father] has failed to make one full monthly payment on behalf of either child.

This finding is insufficient. The Supreme Court has explicitly held that "*the trial court* is the proper court to make a determination of willfulness." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003) (emphasis added); *see also In re Angela T.*, No. W2011-01588-COA-R3-PT, 2012 WL 586864 at *5 (Tenn. Ct. App. W.S., filed Feb. 23, 2012), *rev'd in part on other grounds*; *In re Adoption of Angela E.*, 402 S.W.3d 636 ("Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are the proper courts to make a determination of willfulness"). In keeping with this general principle, we have repeatedly held that,

> [c]ourts terminating parental rights are explicitly required to "enter an order which makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn. Code Ann. § 36-1-113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

*White v. Farley*, No. E2005-00396-COA-R3-PT, 2005 WL 2604050 at *5 (Tenn. Ct. App. E.S., filed Oct. 14, 2005); *see also In re Maria B.S.*, No. E2011-01784-COA-R3-PT, 2012 WL 1431244 at *3 (Tenn. Ct. App. W.S., filed Apr. 25, 2012) ("When a trial court has not complied with Tenn. Code Ann. § 36-1-113(k), we cannot simply review the record de novo

and determine for ourselves where the preponderance of the evidence lies as we would in other civil, non-jury cases") (internal quotation marks omitted); ***In re G.N.S.***, No. W2006-01437-COA-R3-PT, 2006 WL 3626322 at *5-7 (Tenn. Ct. App. W.S., filed Dec. 13, 2006).

While we would normally remand a case like this with directions to the trial court to address the issue of "willfulness," such is not necessary in this case because we have determined there is another ground for termination that was established by clear and convincing evidence.

We modify the trial court's judgment to reverse the trial court's finding of abandonment by failure to pay child support.

B.

The trial court terminated Father's parental rights on the ground of abandonment by failure to provide a suitable home, as codified at Tenn. Code Ann. § 36-1-102(1)(A)(ii), which provides as follows in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> \* \* \*
>
> (ii) The child has been removed from the home of the . . . parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the . . . parent or parents or a guardian or guardians to establish a suitable home for the child, but that the . . . parent or parents or a guardian or guardians have made no reasonable efforts to provide a suitable

-8-

home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

The statute requires proof that the Children were removed from the home of the parent whose parental rights are sought to be terminated. In this case, the Children were not removed from Father's home. There is no evidence in the record pertaining to Father's residence during the four months following either the Children's first removal from Mother's home on March 1, 2011, or the second removal after the trial home visit with Mother that ended May 17, 2011. As discussed further below, the absence of proof regarding Father's residence is largely due to (1) Father's admission at the time of removal that the Children could not suitably be placed with him; (2) his reaffirmation a year later in court that they "were better off with the State"; and (3) his failure to notify DCS at any time that he intended to seek custody or that he felt his home was then suitable for the Children to live with him. Nevertheless, even assuming *arguendo* that this statutory ground is applicable under the general facts presented here, we are of the opinion that the suitability or lack thereof with respect to Father's residence was not established by clear and convincing evidence. *See **In re Maria S.***, No. E2013-01295-COA-R3-PT, 2013 WL 1304616 at *10 (Tenn. Ct. App. E.S., filed Apr. 1, 2013) (burden of proof not met where "the Children were not removed from Father's home" and the father was incarcerated during the pertinent time). In fact, there is no real evidence, one way or the other, as to the condition of Father's residence. Accordingly, we further modify the trial court's judgment by reversing the trial court's finding of abandonment by failure to provide a suitable home for the Children.

C.

The trial court found that DCS established, by clear and convincing evidence, Father's substantial noncompliance with the statement of responsibilities in his permanency plan. Consequently, the trial court terminated his rights under Tenn. Code Ann. § 36-1-113(g)(2). As noted, Father received and signed the permanency plan on April 21, 2011. The trial court found as follows as pertinent to the ground of substantial noncompliance:

The permanency plan required each of the parents to complete the following tasks: 1) obtain and maintain stable housing for six months; 2) maintain the cleanliness of the home; 3) properly childproof the home; 4) obtain and maintain verifiable income; 5) develop a budget; 6) develop a transportation plan; 7) complete parenting classes; 8) pay child support as ordered; 9) ensure that the children are not around anyone under the influence of drugs or alcohol; and 10) obtain a mental health

assessment and follow all recommendations.  Additionally, [Father] was to attend anger management classes and obtain an alcohol and drug assessment and follow all recommendations.

* * *

[Father] stated in Court on April 26, 2012, that he did not feel he was an appropriate placement for the children and thought the children were, "better off where they were." *He indicated that he did not have any intention o[f] completing his permanency plan*, but wanted to visit with his children. *At that time, he had failed to complete any of the required steps on his permanency plan.*

[Father] did not complete his Alcohol and Drug assessment until August 19, 2012, after the Petition for Termination had been filed.  He testified that he smoked marijuana at the time the children came into custody.  Despite having completed this assessment, he testified that he continued to smoke marijuana through May of 2013.  FSW Crook testified [that Father] admitted he did not wish to stop smoking marijuana.  [Father] did not complete his parenting classes until August 9, 2013, after the Petition for Termination had been filed.

[Father] admitted that he did not provide the lease for his current residence to the Department or to the Guardian ad Litem.  He testified that he just began working a new job the week before the second day of trial.  He admitted that prior to that his work was inconsistent. [Father] testified that he is currently employed by Concrete Repair Specialist[s] and has previously worked for Alguire[] Construction and Concrete Works; however, he failed to provide proper verification of such employment.  [Father] admitted that he currently has no driver's license but that he continues to operate a motor vehicle.

(Emphasis added.)

The evidence does not preponderate against these findings.  As can be seen from the above, a year had passed since his receipt of the permanency plan.  Despite this time span, Father had made *no* progress and testified at an earlier hearing in court that "he had no

intention" of completing the requirements of the plan. Father eventually did complete an alcohol and drug assessment and a mental health assessment, but, as the trial court noted, these efforts did not take place until after the petition to terminate had been filed. Moreover, Father did not complete his parenting classes until after the termination hearing had commenced. We have often held under similar circumstances that such belated efforts are "too little, too late." *See, e.g.*, *In re Alyssa B.*, No. M2011-02698-COA-R3-PT, 2012 WL 3041190 at *4 (Tenn. Ct. App. M.S., filed July 25, 2012); *In re Johnny J.E.M.*, No. E2011-02192-COA-R3-PT, 2012 WL 1929802 at *12 (Tenn. Ct. App. E.S., filed May 29, 2012); *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302 at *10 (Tenn. Ct. App. M.S., filed Apr. 14, 2005) ("This 'too little, too late' concept is often used to describe parents who, despite having an abundance of time and resources, wait until shortly before their termination hearing and then hurriedly try to comply with the obligations in their permanency plans."). We affirm the trial court's judgment terminating Father's parental rights on the ground of substantial noncompliance.

D.

Father argues that the trial court erred in terminating his parental rights under Tenn. Code Ann. § 36-1-113(g)(3), the ground often referred to as "persistence of conditions," which requires proof of the following:

> The child *has been removed from the home of the parent* or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the a parent or parents or a guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the a parent or parents or a guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

(Emphasis added.) As already discussed, the Children were not removed from Father's

home. Moreover, foster care worker Crook testified unequivocally at the termination hearing that the reason for the Children's removal was the environmental neglect resulting from the dangerous and unsanitary conditions *at Mother's residence*. In the recent case of *In re Maria B.S.*, 2013 WL 1304616, we were presented with a similar situation where a father's parental rights were terminated on a finding of persistence of conditions and the children had not been removed from his home. We stated as follows:

> Father was incarcerated at the time of the Children's birth. No one removed the Children from Father – he never had the Children in the first place. There is case precedent to support Father's position that, without removal from that parent's home, the ground of persistent conditions is inapplicable. *See In re T.L.*, No. E2004–02615–COA–R3–PT, 2005 WL 2860202, at *7 (Tenn. Ct. App. Oct. 31, 2005), *Rule 11 appl. perm. appeal denied* Feb. 17, 2006; *In re D.L.B.*, No. W2001–02245–COA–R3–CV, 2002 WL 1838147, at *9 (Tenn. Ct. App. Aug. 6, 2002), *rev'd on other grounds*, 118 S.W.3d 360 (Tenn. 2003); *In re B.P.C.*, M2006–02084–COA–R3–PT, 2007 WL 1159199, at *7 (Tenn. Ct. App. April 18, 2007), *no appl. perm. appeal filed*.

As in the opinions cited above, we hold that the ground of persistence of conditions is not applicable to Father under the circumstances presented here. Accordingly, we further modify the trial court's judgment so as to reverse persistence of conditions as a basis for terminating Father's parental rights.

E.

We now turn to the issue of the best interest of the Children. The applicable statute, Tenn. Code Ann. § 36-1-113(i), provides the following factors to be considered on this issue:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

-12-

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The trial court made the following findings as pertinent to the "best interest" issue:

[Father] has resided in the same location for a consistent period of time; however, he has continued to use illegal drugs making

-13-

his living environment unfit for children. [Father] has not maintained consistent employment nor has he paid consistent child support. [Father] has maintained a supervised visitation schedule with the children; however, the children have not resided with [Father] since August of 2010.

It would be detrimental to the children to remove them from the current and only foster home they have resided in for the past two years. The children have developed a strong bond with the foster family. To take these children from the stable and loving environment that is now their home and put them back into unstable housing with continued environmental concerns would cause harm to the children and would not promote their well-being.

The children have remained placed in their current foster placement . . . since entering custody. [The foster mother] has indicated to the Department that she wishes to adopt the children should they become available for adoption.

The children are doing well in their current foster placement and are very bonded with that family.

FSW Crook testified [the son] was attending Head Start, and that [the daughter] was healthy and happy in the foster home. Although they feel otherwise, neither parent has addressed their issues in a meaningful way, and the children have been in foster care since March, 2011.

As already stated, at the time of their removal from Mother's residence, the son was just over two years old, and the daughter was just over one. Father testified that before the removal in March 2011, "about every other weekend I had one [child] with me or so." In March, Father told DCS that he could take one of the children but not both, and made it clear that his house was not a suitable placement for them because of, among other things, his drug use. After Father cleared up the issue of potential outstanding criminal warrants, he began supervised visits with the children. He testified that "we started [visits] regularly I would say around April of 2012" and that "[b]efore then it was every so often. It wasn't regularly." Father's visitation schedule started at a rate of one hour-long visit per month. Around the beginning of 2013, his visitation increased to one hourly visit per week at a supervised location outside his residence.

The trial court found that DCS made reasonable efforts under the circumstances, and that Father failed to make lasting adjustments of his lifestyle and living conditions such that it would be in the Children's best interest to reside with him. In this regard, Father's statements at the time of removal, and at the court hearing a year later, are enormously significant. Father admitted telling DCS that the Children could not be suitably placed with him when they were removed. A year later, according to foster care worker Crook's testimony,

> Q: On that day in April of 2012, you just stated you were present in court. Did [Father] make any statements to the Court regarding his thoughts on where the children were better off?
>
> A: Yes.
>
> Q: What did he say?
>
> A: He said they were better off with the State, where they were.
>
> Q: Okay. Did he indicate to you or to the Court what his intentions were on whether he was going to complete his permanency plan?
>
> A: He stated to the Court that he wasn't. As far as the permanency plan went, he didn't have any intentions of completing it.

Father did not dispute this testimony, which the trial court obviously credited. Furthermore, Father testified as follows regarding the fact that he never contacted DCS to say that he was interested in getting custody, or more extensive visitation than one hour per week:

> A: I do remember in the very, very – I mean, in the very beginning of our case [Crook] came out for five minutes, and I believe he's been to [Mother's] twenty times.
>
> Q: Okay. And do you remember having a conversation with him, basically, saying if [Mother] can get her stuff together, I want her to get the kids?
>
> A: Yes, I do. Because at the time I didn't think I was suitable to try to take care of the two kids at one time and try to work.

-15-

Q: And you wanted [Mother] to try to get them?

A: Yes.

Q: Did you ever go back to Mr. Crook and call and say, hey, look, I know I told you that I wanted [Mother] to get those kids back, but this is not working, I want those kids?

A: I have not.

DCS's efforts regarding Father's situation were not extensive. Under the circumstances, there was no reason for them to have been. DCS had no notice that Father was ever interested in being considered as a placement for the Children, if he had ever had such an interest. As we have observed, "[r]eunification of a family . . . is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." **In re Tiffany B.***,* 228 S.W.3d 148, 159 (Tenn. Ct. App. 2007), *overruled in part on other grounds,* **In re Kaliyah S.***,* No. E2013–01352–SC–R11–PT, 2015 WL 273659 (Tenn., filed Jan. 22, 2015).

By his own admissions, Father continued to regularly smoke marijuana for the two years after removal, declined to meet the requirements of his parenting plan, and failed to pay child support such that he was in arrears over ten thousand dollars.

As the trial court found, the Children are apparently thriving in their foster care home. The foster family wants to adopt them. At the beginning of the termination hearing, the Children's guardian ad litem took the following position:

> At this point, I agree with the State, in the fact that it's been two years. In my opinion no substantial progress has been made. It's only been patchwork progress, and then it goes back. Making progress and then not having it. Making progress and then not having it again. To me that is instability as opposed to stable housing and employment. So I would agree with the State at this point. It is in the children's best interest to terminate the rights of both parents to allow them long term stability and for them to have someone that will provide for their needs.

The evidence does not preponderate against the trial court's finding, made by clear and convincing evidence, that termination of Father's parental rights is in the best interest of the Children.

V.

The judgment of the trial court is affirmed as modified. We expressly affirm the trial court's judgment terminating Father's parental rights to the Children. Costs on appeal are assessed to the appellant, Father. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE